**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**

| | | | |
|---|---|---|---|
| In re: | ) | Chapter | 7 |
| Michael S. Goldberg, LLC and | ) | Case No. | 09-23370 |
| Michael S. Goldberg, | ) | | |
| Debtors. | ) | | |
| | ) | | |
| | ) | | |
| James Berman, Chapter 7 Trustee for the | ) | | |
| Estates of Michael S. Goldberg, LLC and | ) | | |
| Michael S. Goldberg, | ) | | |
| Plaintiff, | ) | | |
| v. | ) | Adv. Pro. No.  11-02071 | |
| Carl Pavano, *et al.* | ) | | |
| Defendants. | ) | | |

**APPEARANCES**

James Moriarty
ZEISLER & ZEISLER, P.C.                                     Attorney for the Plaintiff
10 Middle Street, 15th Floor
Bridgeport, Connecticut 06604

Mark H. Dean
MARK H. DEAN, P.C.                                          Attorney for the Defendant Roland
241 Main Street                                            LaBonte
Hartford, Connecticut 06106

**MEMORANDUM OF DECISION AFTER TRIAL**

Julie A. Manning, Chief United States Bankruptcy Judge

## I.     INTRODUCTION

On December 10, 2018, a trial was held on the amended complaint (the "Amended

Complaint") filed by James Berman, the Chapter 7 Trustee (the "Plaintiff"), as it pertains to the

Defendant, Roland G. LaBonte ("Roland LaBonte").  The Amended Complaint alleges that Roland

LaBonte, through his son Scott A. LaBonte ("Scott LaBonte"), invested $300,000.00 in a Ponzi

scheme operated by the Debtors.  Pursuant to 11 U.S.C. §§ 548(a)(1)(A), 544(b)(1), and Conn.

Gen. Stat. § 52-552e(a)(1), the Amended Complaint seeks to avoid a transfer in the amount of

$425,000.00 that Roland LaBonte received for the $300,000.00 investment in the Ponzi scheme (the "LaBonte Transfer"). The Amended Complaint also seeks to recover and preserve the LaBonte Transfer pursuant to 11 U.S.C. §§ 550(a) and 551, and Conn. Gen. Stat. § 52-552h(a). In his answer (the "Answer"), Roland LaBonte asserts that he provided value in return for the LaBonte Transfer, that he did not have knowledge of the Ponzi scheme at the time he received the LaBonte Transfer, and that he received the LaBonte Transfer in good faith.[1]

On December 10, 2018, a trial was held on the Amended Complaint. The Plaintiff called Scott LaBonte and Roland LaBonte as witnesses. The Plaintiff's Exhibits A, B, C, G, H, I, J, K, L, M, N, O, and P were admitted as full exhibits.[2] At the conclusion of the trial, the parties were instructed to file proposed findings of fact and conclusions of law supported by the evidence introduced at trial. The parties filed their respective proposed findings of fact and conclusions of law on February 8, 2019. *See* ECF Nos. 220, 221. For the reasons that follow, judgment will enter in favor of the Plaintiff and against the Defendant Roland LaBonte on Counts One and Two of the Amended Complaint.

## II.    **JURISDICTION**

The United States District Court for the District of Connecticut (the "District Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). The Bankruptcy Court derives its authority to hear and determine this matter pursuant to 28 U.S.C. §157(a) and the Order of Reference of the District Court dated September 21, 1984. This matter is a "core proceeding" pursuant to 28 U.S.C. §§ 157(b)(1), (b)(2)(A) and (b)(2)(H).

---

[1] The Trustee argues that the Answer does not assert an affirmative defense of value and good faith. Although the Answer does not explicitly refer to 11 U.S.C. §§ 548(c), 550(b)(1), or Conn. Gen. Stat. § 52-552i(a), and erroneously characterizes the defense as a special defense, the Court deems the Answer to have raised an affirmative defense of value and good faith.

[2] Exhibits C and O were admitted into evidence in full over Roland LaBonte's objection.

III.    <u>**FINDINGS OF FACT AND CONCLUSIONS OF LAW**</u>

     Pursuant to Federal Rule of Civil Procedure 52, made applicable to this adversary

proceeding by Federal Rule of Bankruptcy Procedure 7052, below are the Court's findings of fact

and conclusions of law.

     A.    <u>**FINDINGS OF FACT**</u>

<strong>The Goldberg Ponzi Scheme</strong>

     1.     For a period of about twelve years, Michael S. Goldberg ("Goldberg") and Michael

S. Goldberg, LLC (which at times used the name Acquisitions Unlimited Group ("AUG"))

(collectively the "Goldberg Debtors"), operated a pure Ponzi scheme (the "Goldberg Scheme").

*See* Pl.'s Ex. P at 3-4.[3]  The Goldberg Scheme did not involve any legitimate, actual business, or

investment activity by the Goldberg Debtors.  *See id.* at 4-5.

     2.     The Goldberg Scheme offered investors consistent returns on investment through

two types of business deals: 1) "Diamond Liquidation Deals"; and 2) "Chase Asset Deals."  *See*

Pl.'s Ex. P at 14.  As the Goldberg Scheme expanded, the Goldberg Debtors phased out the

Diamond Liquidation Deals and came to rely more heavily on the Chase Asset Deals.  *See* Pl.'s Ex.

G at 10.

     3.     The Chase Asset Deals purportedly gave the Goldberg Debtors the contractual right

to purchase foreclosed construction equipment from Chase Manhattan Bank at a deep discount that

---

[3] All exhibits admitted into evidence during the trial will be referred to as "Pl.'s Ex. __ at __."
Several Findings of Fact in this Memorandum of Decision are contained in the Amended Proposed
Findings of Fact and Conclusions of Law issued by the Honorable Albert S. Dabrowski in the
adversary proceeding commenced by the Plaintiff entitled *Berman v. Malley, et al.*, Adv. Pro. 10-
2082 (the "Amended Findings").  Pl.'s Ex. P.  The United States District Court for the District of
Connecticut accepted the Amended Findings with minor exceptions not relevant here (the "District
Court Order").  Pl.'s Ex. I.

the Goldberg Debtors would then resell, in prearranged sales, to large companies at huge profits. *See* Pl.'s Ex. P at 14. The Goldberg Debtors also claimed that the Chase Asset Deals required Chase Manhattan Bank to refund the full amount of the purchase price of the foreclosed construction equipment if the Goldberg Debtors were unable to resell the equipment. *See* Pl.'s Ex. G at 11; *see also* Pl.'s Ex. P at 19.

4.      In contracts with investors in the Chase Asset Deals (the "Chase Contract(s)"), Goldberg, acting on behalf of the Goldberg Debtors, represented that he would use investor funds to buy foreclosed or seized properties for resale and give investors back their initial investment plus a 20% profit margin after a period of 90 days. *See* Pl.'s Ex. G at 10-11; Pl.'s Ex. P at 15. One investor in the Chase Asset Deals was Roland LaBonte's cousin-in-law, Edward Malley ("Malley"). *See* Pl.'s Ex. P at 26.

5.      The term of the Chase Contracts was generally 90 days. Several investors reinvested all of the proceeds from earlier investments into one or more subsequent Chase Contracts so that the effective annual returns would be substantially in excess of 100% because of compounded profits.[4] In many of the Chase Contracts, Goldberg represented that he, not the investor, would be responsible for paying any income tax owed by the investors on the profits generated by the resale of the equipment. *See* Pl.'s Ex. P at 16.

6.      The only revenues generated by the Goldberg Scheme were funds the Goldberg Debtors collected from a succession of new investors, which were then used to repay the earlier investors their original investment. *See* Pl.'s Ex. P at 4-5.

---

[4] By way of illustration, a hypothetical investor in the Goldberg Scheme who made an initial investment of $100.00 would arguably be entitled to $120.00 after 90 days, $144.00 after 180 days, $172.80 after 270 days, and $207.36 after 360 days under the terms of one of the Chase Contracts.

7.      As word of high returns spread, an increasing number of people invested in the Goldberg Scheme.  *See* Pl.'s Ex. P at 16-17.  The increased investment activity was largely attributable to "feeders."  *See id.*  These feeders located new investors and were compensated by the Goldberg Debtors for doing so through the payment of a "finder's fee"; in some instances, a feeder received a finder's fee of up to 10% on investments made by the new investor.  Pl.'s Ex. G at 11; Pl.'s Ex. P at 16-17.  In other instances, instead of a finder's fee, a "loan fee" was charged by the feeder which was taken out of the third-party investor's funds before the funds were invested in the Goldberg Scheme.  Pl.'s Ex. P at 17.  Malley was a feeder in the Goldberg Scheme.  *See id.* at 20-21.  Scott LaBonte was also a feeder in the Goldberg Scheme.  *See* Pl.'s Ex. I at 4; PL.'s Ex. P at 31; *see also* Tr. 61:4-7.

8.      Malley received the largest sums of money for investment in the Goldberg Scheme from Scott LaBonte.  Pl.'s Ex. P at 28.  All of the money Scott LaBonte provided to Malley was invested with the Goldberg Debtors.  Pl.'s Ex. P at 29.

9.      Between July 15, 2005 and September 16, 2008, Malley directly invested $1,285,000.00 of his own money in the Goldberg Scheme, and invested $3,934,500.00 he solicited from third parties as a feeder in the Goldberg Scheme.  Pl.'s Ex. P at 20.  Malley turned these funds over to the Goldberg Debtors through an Interest On Lawyer Trust Account of the law firm Kablick & Leary, P.C., which was managed by Jon C. Leary[5], Malley's attorney, on Malley's behalf (the "IOLTA Account").  *See* Pl.'s Ex. P at 20-21.

10.      The majority of the payments Malley received from the Goldberg Debtors were paid through the IOLTA Account.  Pl.'s Ex. P at 21.  Between July 17, 2008 and November 4, 2009, the

---

[5] On July 20, 2011, a stipulated judgment was entered against Jon C. Leary in *Berman v. Malley*, Adv. Pro. No. 10-2082, ECF No. 442 in the amount of $1,189,250.00 in connection with his role in the Goldberg Scheme.

Goldberg Debtors transferred $12,366,000.00 to the IOLTA Account, which was then distributed either to Malley, or at Malley's direction, to third parties who had provided funds to him to invest in the Goldberg Scheme.  Pl.'s Ex. P at 21-22.

### Scott LaBonte's involvement in the Goldberg Scheme

11.      Scott LaBonte first became involved in the Goldberg Scheme in 2005.  He had several lunches with Malley during which Malley explained the Goldberg Debtors' business model, described earning rates of return of 80% to 85% on investments, and asked if Scott LaBonte would be interested in investing.  Pl.'s Ex. P at 28.  Scott LaBonte admitted to performing little due diligence before investing in the Goldberg Scheme.  *Id.*

12.      On or about January 16, 2006, Scott LaBonte began to invest money in the Goldberg Scheme through Malley. [6]  In general terms, the investments involved Scott LaBonte loaning money to Malley in exchange for Malley executing a promissory note in favor of Scott LaBonte. Pl.'s Ex. P at 29.  In total, Malley executed six promissory notes payable to Scott LaBonte for money Scott LaBonte invested in the Goldberg Scheme.  *Id.*

13.      On January 16, 2006, Scott LaBonte invested $100,000.00 of his own money in the Goldberg Scheme through funds given to Malley.  Pl.'s Ex. P at 29.  On that date, Malley signed a promissory note to Scott LaBonte in the amount of $100,000.00 plus 12% interest payable within 45 days.  Pl.'s Ex. P at 29.  The January 16, 2006 promissory note also provided for a $10,000.00 loan fee payable to Scott LaBonte upon execution of the note.  *Id.*  The promissory note was governed by Connecticut law.  *Id.* at 30.  The promissory note was timely repaid within the 45 days (on or about March 2, 2006).  *See id.*

---

[6] *See* Transcript of December 10, 2018 Trial (hereinafter "Tr.") 11:23-12:9; 12:17-19; Pl.'s Ex. P at 29.

14.    After repayment of the first promissory note, Scott LaBonte attended a dinner meeting with Goldberg and Malley because he wanted to know more about how his investment was being put to use.  Pl.'s Ex. P at 30.  At the meeting, Goldberg explained that his purported business – the "business" upon which the Goldberg Scheme was based – involved purchasing foreclosed assets at a significant discount.  *Id.*  Scott LaBonte did not request that Goldberg, Goldberg's accountant, or Goldberg's attorney provide him with any financial statements or tax returns that supported Goldberg's representations.  Scott LaBonte also did not seek information about Goldberg from his own accountant or attorney.  *Id.*

15.    On September 28, 2006, Scott LaBonte invested $500,000.00 of his own money in the Goldberg Scheme through funds given to Malley.  Pl.'s Ex. P at 31.  Malley executed a promissory note to Scott LaBonte in the amount of $500,000.00 plus 40% interest payable within 30 days.  *Id.*; Pl.'s Ex. B.

**Roland LaBonte and his involvement in the Goldberg Scheme**

16.    Roland LaBonte is a sophisticated businessman and real estate developer.  Tr. 46:14-16.  Throughout his forty-year career developing real estate, Roland LaBonte served as President, Chief Executive Officer, and Chairman of Devcon Enterprises, Inc. ("Devcon"), a family-owned business that he founded with his father-in-law in 1976.  Among other things, Devcon invested, developed, and managed pharmacy and supermarket-anchored shopping centers.  *See* Tr. 46:17-47:1; 47:11-15; Pl.'s Ex. P at 12.  According to Roland LaBonte's testimony during trial, Devcon

no longer existed in December 2018, but he continued to work in commercial property management as manager of DEI Property Management, LLC.[7]  Tr. 47:2-10.

17.      During Roland LaBonte's tenure as Devcon's President, Chief Executive Officer, and/or Chairman, Devcon was in the business of real estate development and property management.  Tr. 47:25-48:5.  Devcon would "acquire [] land, design[] the property, obtain[] financing, build it, own it, and manage it."  Tr. 48:9-15.  Devcon had an affiliated company, Devcon Construction, Inc. ("Devcon Construction"), which provided construction services for Devcon's real estate development projects.  Tr. 48:14-49:14.  "Devcon Construction was a general contractor that built the properties," with "the properties" consisting primarily of elderly housing, residential housing, and shopping centers.  Tr. 49:10-17.  Through Devcon, Roland LaBonte developed, constructed, and managed dozens of residential and shopping center properties.  *See* Pl.'s Ex. O at 8-9 of 12; Tr. 55:17-21, 56:21-59:21.  Roland LaBonte estimated that he has been involved in fifteen to twenty real estate development deals over the course of his career.  Tr. 73:9-73:13.  As a result of his decades of experience in developing commercial real estate, Roland LaBonte was knowledgeable about real estate development projects in the New England region. Tr. 69:4-8.

18.      In his roles at Devcon, Roland LaBonte reviewed financing documents from lenders. Tr. 54:25-55:16; 72:1-10.  Roland LaBonte negotiated with lenders and reviewed contracts from lenders for financing commercial and residential properties such as the company's shopping centers and Section 8 senior housing, which required reviewing the terms of the financing to make sure

---

[7] The Trustee has brought an adversary proceeding against DEI Property Management, LLC alleging claims similar to those alleged in this adversary proceeding.  *See Berman v. DEI Property Mgmt. et al.*, Adv. Pro. No. 17-2029.

they were acceptable. Tr. 55:3-55:13; 71:25-72:10. Roland LaBonte was also personally involved in putting together and marketing tax syndication arrangements by which investors would invest in real estate development projects to obtain tax benefits. Tr. 72:12-73:8.

19.     Roland LaBonte assumed the position of Chairman at Devcon and Scott LaBonte succeeded his father as the President and Chief Executive Officer. Tr. 9:14-17; 51:15-52:24; 61:4-7; Pl.'s Ex. P at 12; Pl.'s Ex. I at 4.

20.     Roland LaBonte became involved in the Goldberg Scheme on or before January 1, 2007, when he provided Scott LaBonte with $300,000.00 to invest in the Goldberg Scheme. On January 1, 2007, Scott LaBonte gave Malley $900,000.00 for investment in the Goldberg Scheme, which included the $300,000.00 Roland LaBonte provided to Scott LaBonte, as well as funds from four other investors. Pl.'s Ex. P at 31-32. Malley then executed a promissory note payable to Scott LaBonte in the amount of $900,000.00 plus 25% interest within one year. Pl.'s Ex. B; Pl.'s Ex. P at 31-32. The January 1, 2007 promissory note provided for a $180,000.00 loan fee payable to Scott LaBonte upon execution of the note. Pl.'s Ex. B; Pl.'s Ex. P at 32.

21.     Roland LaBonte structured his $300,000.00 investment in the Goldberg Scheme as a loan to Scott LaBonte. Tr. 12:2-16; 15:18-16:3; 62:6-10; Pl.'s Ex. I at 4; Pl.'s Ex. P at 31. Before providing the $300,000.00 to Scott LaBonte, Roland LaBonte had never made a loan to any of his children and has not made a loan to any of his children since. Tr. 82:20-84:7. Although structured as a loan, Roland LaBonte knew at the time he provided the $300,000.00 to Scott LaBonte that the money would be invested with the Goldberg Debtors. Tr. 31:1-3; 62:17-64:3.

22.     In exchange for the $300,000.00 Roland LaBonte provided to Scott LaBonte, on January 1, 2007, Scott LaBonte issued a promissory note to Roland LaBonte in the principal

amount of $300,000.00 (the "Roland LaBonte Note").[8]  *See* Pl.'s Ex. A.  The Roland LaBonte Note

was payable on demand at any time after January 1, 2008, included interest at the rate of 25% per

annum, was governed by Nevada Law to avoid violating Connecticut usury laws, and required the

loaned money to be used only for investment in AUG.  *See* Pl.'s Ex. A; Tr. 19:24-20:2; 21:11-19;

23:6-18.  The terms of the Roland LaBonte Note mirrored the terms of the January 1, 2007

promissory note Malley executed in favor of Scott LaBonte.  *See* Pl.'s Ex. A and B; Pl.'s Ex. P at

31-34; Tr. 12:2-16; 19:5-21:19; 23:10-18.

23.     Roland LaBonte and Scott LaBonte had no connection to Nevada at the time the

Roland LaBonte Note was issued.  Tr. 87:17-88:25.  Before investing in the Goldberg Scheme,

Roland LaBonte had entered into one other transaction that was governed by Nevada law: an

investment in what is referred to as the Rothstein Ponzi scheme.  Tr. 89:1-90:12.  As was true with

the Roland LaBonte Note, Roland LaBonte knew of no connection to Nevada with respect to the

Rothstein Ponzi scheme.  Tr. 89:1-90:12.  Other than his investment in the Goldberg Scheme, the

only personal loan that Roland LaBonte made that paid a rate of return greater than 10% was his

investment in the Rothstein Ponzi scheme.  Tr. 85:2-21.

24.     Prior to providing the $300,000.00 to Scott LaBonte, Roland LaBonte had a single

discussion with Scott LaBonte concerning the Goldberg Debtors' business.  During that discussion,

Scott LaBonte told Roland LaBonte that:

> [T]his guy, Goldberg, was negotiating with banks to buy foreclosed construction materials
> that a builder would default on when - - where the bank would take the inventory back.  And

---

[8] At trial, Roland LaBonte could not recall Scott LaBonte ever providing him with a copy of the
Roland LaBonte Note and claimed he had never seen the note before retaining his trial counsel in
2017.  Tr. 76:17-77:6; 77:21-77:23.  This claim is belied by evidence in the record.  First, Scott
LaBonte testified that he provided a signed copy of the Roland LaBonte Note to Roland LaBonte.
Tr. 23:6-9.  Second, the circumstantial evidence shows that the payments to Roland LaBonte
complied with the terms of the Roland LaBonte Note.  *See* Tr. 24:17-22; 32:16-33:7; 83:2-6; 90:19-
91:2.  Third, Roland LaBonte was served with a copy of the note and the Answer admitted that
Roland LaBonte made one or more loans memorialized by a promissory note.  Tr. 77:10-77:20.

this guy, Goldberg, would negotiate with the bank at a deep, deep discount and turn around and sell them for a substantial profit.

Tr. 26:10-14; 29:12-30:24; 65:2-67:2.

25.     Roland LaBonte did not ask Scott LaBonte who Goldberg was, and did not have any discussions with Malley about Goldberg or Goldberg's business, before he provided Scott LaBonte with the $300,000.00 to invest in the Goldberg Scheme.  Tr. 64:9-65:1.  Roland LaBonte conducted no due diligence at any time regarding Goldberg, Goldberg's business, or AUG.  Tr. 31:4-11; 32:9-15; 74:1-77:24; 79:11-25; 81:1-5.  Roland LaBonte made the $300,000.00 investment based solely on the single conversation he had with Scott LaBonte about the Goldberg Debtors' purported business.  Tr. 32:9-15; 82:9-16.

26.     At no point either before or after providing the $300,000.00 to Scott LaBonte did Roland LaBonte perform any due diligence to determine whether Goldberg's business model was plausible.  Tr. 79:11-79:25.  Roland LaBonte did not ask to review any agreements between Malley and Goldberg before providing the $300,000.00 to Scott LaBonte.  Tr. 81:1-81:5.  While Roland LaBonte had  knowledge of real estate development projects during his tenure as Chief Executive Officer and chairman of Devcon, he could not recall a single project in New England that was foreclosed upon while under construction.  Tr. 69:4-69:12.  Moreover, Roland LaBonte could not identify any real estate project that was foreclosed upon while under development where the foreclosing lender removed building materials, e.g., windows, doors, electrical or plumbing fixtures, from the partially developed project.  Tr. 70:13-22.  Furthermore, Roland LaBonte could not identify any instance where Devcon, Devcon Construction, or any construction manager he oversaw had ever purchased materials from a lender that had foreclosed on a building site.  Tr. 70:13-70:22.

11

27.    At the time that he provided the $300,000.00 to Scott LaBonte, Roland LaBonte believed that both Scott LaBonte and Malley would receive some remuneration from the Goldberg Debtors for facilitating the transaction.  Tr. 91:3-92:25.  Scott LaBonte told Roland LaBonte that he would be making a profit on Roland LaBonte's investment and Roland LaBonte assumed Malley would as well.  Tr. 25:17-26:1; 92:3-92:9; 92:20-92:25.  Roland LaBonte knew that the Goldberg Debtors would have to be paying more than 25% per annum on his investment in order for Malley to be paid, Scott LaBonte to be paid, and for him to receive a 25% rate of return.  Tr. 92:20-93:14.

28.    After Roland LaBonte's January 2007 investment in the Goldberg Scheme, Scott LaBonte continued to invest funds in the Goldberg Scheme through a series of promissory notes executed by Malley in favor of Scott LaBonte.

29.    Scott LaBonte received payment on the promissory notes from the IOLTA Account as directed by Malley.  Pl.'s Ex. P at 34.  In total, Scott LaBonte received $7,241,797.52 from the IOLTA Account.  Pl.'s Ex. P at 22; Tr. 33:8-35:10.  When Scott LaBonte received a payment from Malley, he would, in turn, repay other investors, including Roland LaBonte.  Pl.'s Ex. P at 34; Tr. 33:8-35:10.

30.    On August 14, 2008, Roland LaBonte received the LaBonte Transfer which consisted of the repayment of his $300,000.00 investment plus $125,000.00 in interest.  Tr. 24:17-22; 32:16-33:7.  Roland LaBonte received the LaBonte Transfer from Scott LaBonte, but the funds were generated by the Goldberg Scheme.  *See* Tr. 33:8-35:10; Pl.'s Ex. P at 16, 20-22, 34.  Before he received the LaBonte Transfer, Roland LaBonte believed that repayment of the $300,000.00

would be paid with funds from the Goldberg Scheme and not from Scott LaBonte's personal funds.[9]  Tr. 94:8-95:12.

31.    Before the LaBonte Transfer was made, Scott LaBonte told Roland LaBonte that he was "getting concerned that this may not be what he thought it was, and that he was getting as much out of this as he could because he was uncomfortable with Ed Malley and he wanted to make sure that we all got paid back."  Tr. 95:13-96:1; 97:14-21; 100:7-12; Pl.'s Ex. C.  Roland LaBonte understood his son's comment "that he was concerned that this might not be what he thought it was," to mean that Scott LaBonte "was getting nervous that [the Goldberg Scheme] may not be legit in so many words."  Tr. 96:2-15.  Despite his belief that his son had concerns about the legitimacy of the Goldberg Scheme, Roland LaBonte did not undertake any investigation to determine whether the Goldberg Debtors' purported business was legitimate or whether the LaBonte Transfer was fraudulent.  Tr. 100:13-101:5.

32.    At the time Roland LaBonte received the LaBonte Transfer, there were creditors who had valid claims against the Goldberg Debtors.  *See* Pl.'s Ex. J, K, L, M, and N.

### The Goldberg Debtors' bankruptcy case

33.    By the fall of 2009, the Goldberg Scheme was collapsing.  *See* Pl.'s Ex. P at 17. When investors began demanding payment in full on their investments, the Goldberg Debtors began making late payments while trying to find replacement investors.  *See id.*  In November 2009, Goldberg voluntarily turned himself in to the Federal Bureau of Investigation and admitted to running a Ponzi scheme – the Goldberg Scheme.  *See* Pl.'s Ex. G at 14.  Goldberg pled guilty to

---

[9] Although on cross-examination by his counsel, Roland LaBonte asserted that he "didn't have any expectation" that Goldberg would repay him and was looking to Scott LaBonte for repayment, *see* Tr. 106:21-107:11, Roland LaBonte's testimony on this issue is not credible.

federal wire fraud charges, was sentenced to a term of imprisonment, and was ordered to pay restitution in the amount of $31,023,035.40.  Pl.'s Ex. G at 1; Pl.'s Ex. H.

34.     On November 18, 2009 (the "Petition Date"), certain petitioning creditors filed an involuntary Chapter 7 petition against the Goldberg Debtors.  On November 24, 2009, the Court entered an Order for Relief in the Goldberg Debtors' case and the Plaintiff was elected to be the Chapter 7 Trustee of the estate of the Goldberg Debtors.  On August 29, 2011, the Plaintiff commenced this adversary proceeding against, among others, Roland LaBonte.

35.     On May 14, 2010, the Trustee commenced an adversary proceeding against Malley and Scott LaBonte to avoid and recover transfers they had received that were made by the Goldberg Debtors.  In May 2015, following a five-day trial that was held in June 2011, the Honorable Albert S. Dabrowski issued the Amended Findings.  *See* Pl.'s Ex P.  The Amended Findings determined that both Malley and Scott LaBonte acted as "feeders" in the Goldberg Scheme.  *Id.* at 16, 17, 20, 21, 23 and 31.  The Amended Findings also recommended that judgment enter in the Trustee's favor against Malley in the amount of $14,237,720.77 and against Scott LaBonte in the amount of $7,241,797.52, both with prejudgment interest at the rate of 3.25% running from November 12, 2010.  *See id.* at 95-96; Tr. 11:10-22.  Scott LaBonte, and certain defendants other than Malley, objected to portions of the Amended Findings.

36.     On September 27, 2017, the Honorable Alvin W. Thompson issued the District Court Order in which he rejected all of Scott LaBonte's objections, except for one related to a tax provision in promissory notes between Malley and Scott LaBonte, and entered judgment against Malley and Scott LaBonte.  *See* Pl.'s Ex. I at 11.  The District Court Order and entry of judgment has not been appealed.  *See* Tr. 10:14-16; 10:20-11:6.

B.    **CONCLUSIONS OF LAW**

    1.    **Count One:  Actual Fraudulent Transfer Under 11 U.S.C. § 548, Recovery Under 11 U.S.C. § 550, and Preservation Under 11 U.S.C. § 551**

In Count One of the Amended Complaint, the Trustee seeks to avoid the LaBonte Transfer under section 548(a)(1)(A), to recover the LaBonte Transfer under section 550, and to preserve the LaBonte Transfer for the benefit of the estate under section 551.

    a.    **Actual Fraudulent Transfer Under 11 U.S.C. § 548(a)(1)(A)**

In order to establish an actual fraudulent transfer under section 548(a)(1)(A), the Trustee must prove three elements: "(i) a transfer of an interest of the debtor in property; (ii) made within two years before the debtor filed for bankruptcy; and (iii) done with actual intent to hinder, delay, or defraud the debtor or any entity the debtor would become after the transfer." *In re 1031 Tax Grp., LLC*, 439 B.R. 47, 68 (Bankr. S.D.N.Y. 2010) *supplemented,* 439 B.R. 78 (Bankr. S.D.N.Y. 2010).  The Trustee must prove each of these three elements by a preponderance of the evidence. *See In re LXEng LLC*, 607 B.R. 67, 91 (Bankr. D. Conn. 2019).

The Trustee has proved the LaBonte Transfer is a fraudulent transfer by a preponderance of the evidence.  As set forth in the Findings of Fact, the LaBonte Transfer originated with the Goldberg Debtors and was received by Roland LaBonte within two years of the Petition Date.  *See* Findings of Fact at ¶ 30, 34.  Further, the LaBonte Transfer was made with actual intent to hinder, delay, or defraud creditors pursuant to the Ponzi scheme presumption.  When the transferor "operated a Ponzi scheme and the transfers are made in furtherance of the Ponzi scheme," the intent to hinder, delay, or defraud creditors "is presumed." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 603 B.R. 682, 688 (Bankr. S.D.N.Y. 2019); *In re Bernard L. Madoff Inv. Sec., LLC*, 440 B.R. 243, 255 (Bankr. S.D.N.Y. 2010) ("It is now well recognized that the existence of a Ponzi scheme establishes that transfers were made with the intent to hinder, delay and defraud creditors.")

(citing *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 8 (S.D.N.Y. 2007) ("[T]ransfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors.")).  The Findings of Fact establish that the transferor, the Goldberg Debtors, operated a Ponzi scheme in which Scott LaBonte was a feeder. *See* Findings of Fact at ¶ 1, 7, 33.  In addition, the LaBonte Transfer was made in furtherance of the Ponzi scheme because Roland LaBonte received the principal and interest for his investment in the Goldberg Scheme from the Goldberg Debtors.  *See id.* at ¶ 30.  Therefore, the Trustee has proven the LaBonte Transfer is an actual fraudulent transfer under section 548(a)(1)(A).

As a defense to the actual fraudulent transfer claim, Roland LaBonte argues that because he provided value and acted in good faith, the LaBonte Transfer cannot be avoided.  "Section 548(c) provides a defense to a fraudulent transfer claim brought under Bankruptcy Code § 548(a) to the extent the transferee takes for value and in good faith."  *In re Bernard L. Madoff Inv. Sec. LLC*, 515 B.R. 117, 138 (Bankr. S.D.N.Y. 2014).  The transferee has the burden of proving the good faith and value affirmative defense.  *In re Bayou Grp., LLC*, 439 B.R. 284, 308 (S.D.N.Y. 2010).  A section 548(c) defense therefore requires proof of both value and good faith; even if the transferee acts in good faith but does not give value, the defense will fail.  *See* 5 *Collier on Bankruptcy*, ¶ 548.09 (16th ed. 2020).

Although Roland LaBonte provided $300,000.00 to the Goldberg Debtors, which is arguably "value," the LaBonte Transfer was an actual fraudulent transfer and therefore the entire amount of the transfer can be recovered.  *See In re Bayou Grp. LLC*, 362 B.R. 624, 629 (Bankr. S.D.N.Y. 2007) (Section 548 "like analogous provisions under state law, avoids the entire amount of 'any transfer' which was made by the transferor with actual intent to hinder, delay or defraud creditors.  Moreover, the entirety of the transfer is avoidable whether or not the debtor received value in exchange, and the plaintiff need not allege and prove that the transfer was for less than fair

value if actual intent is alleged and proved under Section 548(a)(1)(A)").  Consistent with the statutory language in section 548(a) enabling the Trustee to avoid "any transfer," and consistent with the authority cited above, courts have held in the context of fraudulent investment schemes that the entirety of payments made to investors may be avoided, including repayments of principal actually made by investors.  *Id.* at 630 (citations omitted).  Therefore, Roland LaBonte has failed to establish that he took the LaBonte Transfer "for value" under section 548(c).

Turning to the good faith component of a section 548(c) defense, courts generally engage in a two-step inquiry to determine whether the transferee took the transfer in good faith.  *See Bayou Grp., LLC*, 439 B.R. at 310.  First, courts consider "whether the transferee had information that put it on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose."  *Id.*  Next, "[o]nce a transferee has been put on inquiry notice of either the transferor's possible insolvency or of the possibly fraudulent purpose of the transfer, the transferee must satisfy a 'diligent investigation' requirement."  *Id.* at 312.  "An objective, reasonable investor standard applies to both the inquiry notice and the diligent investigation components of the good faith test."  *Id.* at 313.  Under this objective test, "courts look to what the transferee objectively 'knew or should have known' in questions of good faith, rather than examining what the transferee actually knew from a subjective standpoint." *Id.* (citing *Hayes v. Palm Seedlings Partners–A (In re Agric. Research & Tech. Grp.)*, 916 F.2d 528, 535-36 (9th Cir. 1990)).

As set forth in the Findings of Fact, Roland LaBonte was a sophisticated businessperson and real estate developer with forty years of experience as a corporate officer before he received the LaBonte Transfer.  *See* Findings of Fact at ¶ 16-19.  He had knowledge of facts that should have put a reasonably prudent investor with similar knowledge and experience on inquiry notice of the potentially fraudulent nature of the Goldberg Scheme.  *See id.* at ¶ 16-19, 24-27.  The information Roland LaBonte had about the Goldberg Scheme, which purportedly used investor funds to buy

foreclosed or seized properties for resale to give investors back their initial investment plus a 20% profit margin, was sufficient to put him on notice of the fraudulent nature of the Goldberg Scheme given his knowledge and business experience.  *See id.*

The terms of the investment also should have put a reasonably prudent investor with knowledge and experience similar to Roland LaBonte on notice of the fraudulent nature of the Goldberg Scheme.  In addition to the 25% per annum return on investment Scott LaBonte promised, Roland LaBonte also knew that Scott LaBonte was receiving a loan fee and assumed Malley was as well.  *See id.* at ¶ 27.  Roland LaBonte therefore knew that the Goldberg Debtors' business would need to generate a rate of return greater than 25% per annum for Scott LaBonte and Malley to be compensated.  *See id.*  Roland LaBonte had himself never taken a personal loan that charged more than 10% interest and the only other "loan" he ever made approaching the rate of return promised by the Goldberg Scheme was an investment he made in another Ponzi scheme, the Rothstein Ponzi scheme.  *See id.* at ¶ 23.

Further, the evidence establishes that Roland LaBonte was on notice that further inquiry was required.  Before Roland LaBonte received the LaBonte Transfer, he was aware of Scott LaBonte's concerns.  Scott LaBonte told Roland LaBonte that "this might not be what he thought it was, and that he was getting as much out of this as he could because he was uncomfortable with Ed Malley and he wanted *to make sure that we all got paid back*."  *See id.* at ¶ 31 (emphasis added).  Roland LaBonte understood this statement to mean that "[Scott] was getting nervous that it might not be legit in so many words."  *See id.*

Despite the many "red flags," Roland LaBonte failed to inquire about the Goldberg Debtors' business model or Scott LaBonte's concerns about the legitimacy of the business.  *See id.* at ¶ 25-26, 31.  Although Roland LaBonte conducted due diligence on real estate development projects in his role as CEO and chairman of Devcon, and could not recall entering into any real

18

estate development deal without first performing due diligence, he performed no due diligence whatsoever regarding his investment in the Goldberg Scheme. *See id.* at ¶ 25-26. Instead, Roland LaBonte relied on Scott LaBonte's description of the business and nothing more. *See id.* at ¶ 24-25. Roland LaBonte did not ask any questions about the Goldberg Debtors and he did not ask to review any agreements between Malley and Goldberg before loaning Scott LaBonte $300,000.00 to invest in the Goldberg Scheme. *See id.* at ¶ 26.

In sum, Roland LaBonte has not established a valid defense under section 548(c). Accordingly, the Trustee has met his burden of proof by a preponderance of the evidence that the LaBonte Transfer is avoidable under section 548(a)(1)(A).

### b.  Recovery Under 11 U.S.C. § 550(a)

Once a transfer has been avoided, section 550(a) of the Bankruptcy Code "provides that the trustee/debtor-in-possession 'may recover for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property ...'" *See In re Belmonte*, 931 F.3d 147, 152 (2d Cir. 2019); *In re Tronox Inc.*, 464 B.R. 606, 613 (Bankr. S.D.N.Y. 2012). Section 550(b)(1) provides a complete defense to recovery to a subsequent transferee who "takes for value ... in good faith, without knowledge of the voidability of the transfer." *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 563 B.R. 737, 752 (Bankr. S.D.N.Y. 2017). While courts differ "on the issue of whether the plaintiff carries the burden of proof to show the absence of a defense under section 550(b), or whether this burden falls to the defendant to demonstrate the three requirements of the statute," when, as here, the "preponderance of evidence indicates the same outcome without regard to burden of proof," the issue of who had the burden need not be decided. *See In re CNB Int'l, Inc.*, 393 B.R. 306, 329 (Bankr. W.D.N.Y. 2008), *aff'd on other grounds,* 440 B.R. 31 (W.D.N.Y. 2010).

Section 550(a) "is a remedies section and defines the party from whom a trustee may seek to recover property that is fraudulently transferred or the value or proceeds of such property." *In re Allou Distributors, Inc.*, 379 B.R. 5, 19 (Bankr. E.D.N.Y. 2007). Pursuant to section 550(a)(1) either an "initial transferee" or "the entity for whose benefit such transfer was made" is liable for an avoided transfer. 11 U.S.C. § 550(a)(1). Pursuant to section 550(a)(2), "any immediate or mediate transferee of such initial transferee" may be liable for an avoided transfer. 11 U.S.C. § 550(a)(2). A subsequent transferee (i.e. an immediate or mediate transferee under section 550(a)(2)) may have a defense to an avoidance action under section 550(b)(1) if the subsequent transferee "takes for value, including satisfaction or securing a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided." 11 U.S.C. § 550(b)(1).

In order to prevail on a claim under section 550(a)(2), the Trustee has the burden of establishing the "tracing elements" of such a claim. *Allou Distributors*, 379 B.R. at 29-30. "That is, in order to prove a Section 550(a)(2) claim, a plaintiff must carry its burden to establish that the funds at issue are property of the estate—but this burden is not so onerous as to require "dollar-for-dollar accounting" of "the exact funds" at issue." *Id.* at 30; *cf. Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 531 B.R. 439, 473 (Bankr. S.D.N.Y. 2015) ("To plead the subsequent transfer prong, the complaint must allege facts that support the inference that the funds at issue originated with the debtor, and contain the necessary vital statistics—the who, when, and how much of the purported transfers to establish an entity as a subsequent transferee of the funds.") (internal quotation marks and citations omitted).

In accordance with section 550(a)(2), Roland LaBonte is a mediate transferee because although he received the LaBonte Transfer from Scott LaBonte, the LaBonte Transfer originated with the Goldberg Debtors. *See* Findings of Fact at ¶ 30. As mediate transferee, Roland LaBonte has the right to assert a good faith and value defense to the recovery of the LaBonte Transfer.

However, Roland LaBonte's defense fails because, as set forth above, he did not provide value and did not act in good faith. *See In re Thakur*, 498 B.R. 410, 420 (S.D.N.Y. 2013) ("Courts have applied an objective standard for good faith of a transferee [under 550] similar to that applied under section 548(c) of the Bankruptcy Code ...") (quoting *Enron Corp. v. Bear, Stearns & Co. (In re Enron Corp.)*, No. 01–16034(AJG), 2005 WL 3832059, at *21 (Bankr. S.D.N.Y. Nov. 28, 2005)).

In addition, "[a]side from any issue of good faith, a defense under 11 U.S.C. § 550(b) will arise only if the transferee takes without knowledge of the voidability of the transfer avoided." *In re CNB Int'l, Inc.*, 393 B.R. at 330. A section 550(b) defense fails when "an immediate or mediate transferee has knowledge of a potential basis for the avoidance." *Id.* "The applicable standard looks not for any certainty of avoidance, but for an awareness of that real possibility." *Id.* In order for the section 550(b) defense to apply, the transferee " must have knowledge of sufficient facts that (i) puts the transferee on notice that the transfer might be avoidable or (ii) requires further inquiry into the situation and such inquiry is likely to lead to the conclusion that the transfer might be avoided." *Id.* (citing *Mosier v. Goodwin (In re Goodwin)*, 115 B.R. 674, 677 (Bankr. C.D. Cal. 1990)).

The Findings of Fact establish that Roland LaBonte did not "take without knowledge of the potential avoidance of the transfer." As discussed above, the evidence demonstrates that Roland LaBonte was on notice of facts regarding the fraudulent nature of the transfer and that further inquiry into the situation was required. Accordingly, the Trustee may recover the value of the LaBonte Transfer from Roland LaBonte pursuant to section 550(a).

### c.   Preservation Under 11 U.S.C. § 551

Section 551 of the Bankruptcy Code provides that a transfer avoided under section 548 is automatically "… preserved for the benefit of the estate but only with respect to property of the estate." 11 U.S.C. § 551. To the extent necessary, because the LaBonte Transfer is avoided

pursuant to 11 U.S.C. § 548, the LaBonte Transfer in the amount of $425,000.00 is preserved for the benefit of the estate.

### 2. Count Two:  Avoidance Under 11 U.S.C. § 544 and Conn. Gen. Stat. § 52-552a

Count Two of the Amended Complaint seeks relief under section 544(b)(1) of the Bankruptcy Code, which provides for relief under applicable state law.  The applicable law, Conn. Gen. Stat. § 52-552a *et seq.*, the Connecticut Uniform Fraudulent Transfer Act ("CUFTA"), "provides the statutory framework for transfer avoidance in Connecticut and is not materially distinct from 11 U.S.C. § 548, except for: (1) the extended four-year timeframe prescribed under Conn. Gen. Stat. § 52-552j; (2) the standing requirements as an actual pre-transfer creditor; and (3) the elements of Conn. Gen. Stat. § 52-552e must be proven by clear and convincing evidence."  *In re LXEng LLC*, 607 B.R. at 88.

#### a. Actual Fraudulent Transfer Under Conn. Gen. Stat. 52-552e(a)(1)

The Findings of Fact set forth herein establish that the LaBonte Transfer is avoidable under CUFTA.  The LaBonte Transfer occurred on August 14, 2008, which is within the four-year timeframe established in Conn. Gen. Stat. § 52-552j.  *See* Findings of Fact at ¶ 30.  In addition, the evidence establishes that there were creditors of the Goldberg Debtors whose claims arose before the LaBonte Transfer.  *See id.* at ¶ 32.  Therefore, the Trustee has the requisite standing to avoid the LaBonte Transfer.

The Trustee has also shown, by clear and convincing evidence, that the LaBonte Transfer is an actual fraudulent transfer.  To prove an actual fraudulent transfer under section 52-552e(a)(1) of the Connecticut General Statutes, the Trustee must establish (1) that a transfer of assets took place, (2) that the claim arose before that transfer took place, and (3) that the transferor intended to hinder, delay or defraud the creditor by making the transfer.  *Carney v. Horizon Investments Ltd.*, 107 F.

Supp. 3d 216, 231 (D. Conn. 2015).  Actual intent to defraud is presumed when the transfer was made as part of a Ponzi scheme because "transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors."  *See Carney v. Lopez*, 933 F. Supp. 2d 365, 379 (D. Conn. 2013) (extending the Ponzi scheme presumption to Conn. Gen. Stat. § 52-552e(a)(1)).

The evidence presented at trial demonstrates that a transfer of the Goldberg Debtors' assets occurred when the LaBonte Transfer was made.  *See* Findings of Fact at ¶ 30.  The evidence further establishes that the Goldberg Debtors operated a Ponzi scheme in which Scott LaBonte and Malley were feeders, and that the LaBonte Transfer was in furtherance of the Goldberg Scheme. *See id.* at ¶ 7, 30, 35.  Because the Trustee produced evidence demonstrating a *prima facie* claim under Conn. Gen. Stat. § 52-552e(a)(1), and because Roland LaBonte was not able to refute that evidence, the Trustee has proved by clear and convincing evidence that the LaBonte Transfer is an actual fraudulent conveyance under Connecticut law.

Roland LaBonte argues that he has a good faith and value defense and therefore the LaBonte Transfer cannot be avoided.  Conn. Gen. Stat. 52-552i(a) provides that "[a] transfer or obligation is not voidable under subdivision (1) of subsection (a) of section 52-552e against a person who took in good faith and for a reasonably equivalent value."  A transferee must prove both good faith and reasonably equivalent value by a preponderance of the evidence.  *In re Neri Bros. Construction Corp.*, 593 B.R. 100, 141 (Bankr. D. Conn. 2018).

For the same reasons that Roland LaBonte failed to show that he took the LaBonte Transfer for value and in good faith under the Bankruptcy Code, Roland LaBonte has also failed to show that he took the LaBonte Transfer for value and in good faith under CUFTA.  *See The Cadle Co. v. White*, No. 3:02-CV-00030(TPS), 2006 WL 798900, at *8 (D. Conn. Mar. 21, 2006) (analogizing the concept of good faith under CUFTA to good faith under bankruptcy law); *Quantam Sail Design*

23

*Grp., LLC v. Liberty Enterprises, Inc.*, No. 3:03-CV -81(WWE), 2004 WL 1202721, at *2 (D.
Conn. Mar. 26, 2004) (analyzing good faith under CUFTA and noting that "Connecticut courts
have borrowed from bankruptcy law where, in order to prove good faith, the transfer must have
occurred in an arms-length bargain, and the transferee must have no intent to, or knowledge of the
fact that transaction will, hinder, delay, or defraud others." (citing *Yolen v. Wright,* 2003
Conn.Super. LEXIS 1754, at *2 (Conn. Super. 2003) (citing Bankruptcy. Code, 11 U.S.C. §
548(c)).

Accordingly, the Trustee has demonstrated by clear and convincing evidence that the
LaBonte Transfer should be avoided under 11 U.S.C. § 544 and Conn. Gen. Stat. § 52-552a *et seq.*
as an actual fraudulent transfer.

### b.  Recovery Under 11 U.S.C. § 550(a)

To the extent that a transfer is avoided under section 544, the trustee may recover, for the
benefit of the estate, the property transferred, or, if the court so orders, the value of such property,
from any immediate or mediate transferee of such initial transferee.  11 U.S.C. § 550(a)(2).  The
"good faith" defense in subsection 550(b) for immediate or mediate transferees applies to section
548(c) section and section 544.  *See* 11 U.S.C. § 550.

Because the LaBonte Transfer is avoided pursuant to 11 U.S.C. § 544 and Conn. Gen. Stat.
§ 52-552e(a)(1) and Roland LaBonte is a mediate transferee, the Trustee may recover the LaBonte
Transfer from Roland LaBonte.  In addition, for the reasons set forth above, the good faith and
value defense in 11 U.S.C. § 550(b)(1) fails.

### c.  Preservation Under 11 U.S.C. § 551

Section 551 of the Bankruptcy Code provides that a transfer avoided under section 544 is
automatically "…preserved for the benefit of the estate but only with respect to property of the
estate." 11 U.S.C. § 551.  To the extent necessary, because the LaBonte Transfer is avoided

24

pursuant to 11 U.S.C. § 544, the avoided LaBonte Transfer in the amount of $425,000 is preserved for the benefit of the estate.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, it is hereby

**ORDERED:**  Judgment shall enter in favor of the Plaintiff on Count One of the Amended Complaint.  The LaBonte Transfer in the amount of $425,000.00 is avoided under 11 U.S.C. § 548(a)(1)(A), is recoverable under 11 U.S.C. § 550, and is preserved under 11 U.S.C. § 551; and it is further

**ORDERED:**  Judgment shall enter in favor of the Plaintiff on Count Two of the Amended Complaint.  The LaBonte Transfer in the amount of $425,000.00 is avoided under 11 U.S.C. § 544 and Conn. Gen. Stat. § 52-552a *et seq.*, is recoverable under 11 U.S.C. § 550, and is preserved under 11 U.S.C. § 551.

Dated at Bridgeport, Connecticut this 28th day of August, 2020.

*Julie A. Manning*
*Chief United States Bankruptcy Judge*
*District of Connecticut*